AMALGAMATED HOUSING CORPORATION, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

AMALGAMATED DWELLINGS, INC., PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 80686, 80780.   Promulgated May 10, 1938.

*I. Herman Sher*, *Esq.*, for the petitioners.
*I. M. Tullar*, *Esq.*, for the respondent.

OPINION.

MURDOCK: These petitioners claim that they are instrumentalities of the State of New York, performing an essential governmental function, and, therefore, are not subject to Federal income tax. They cite authorities to show that the housing board was an instrumentality of the state. They were private corporations conducting their own separate businesses and paying taxes to a political subdivision of the State of New York on the land which they owned. They were no part of the government of the State of New York and they may not escape Federal income tax upon the theory that they are instrumentalities of a state performing essential governmental functions.

They also contend that they are exempt from tax under the provisions of section 103 (8) of the Revenue Acts of 1928 and 1932, because they are "civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare." The statute does not define the term "civic league." A league ordinarily implies an unincorporated association of persons who have associated themselves together for some common purpose, a covenant between two or more parties for the accomplishment of some purpose by their cooperation. *Hughes* v. *State*, 160 S. W. 209; *Crooks* v. *Kansas City Hay Dealers' Assn.*, 37 Fed. (2d) 83. "League" is defined in Funk & Wagnalls New Standard Dictionary, 1935, as "an alliance of persons, parties, states, etc., voluntarily maintained, for mutual support in the attainment of a common end." The same authority defines "civic" as "of or pertaining to a city, a citizen, or citizenship." A civic enterprise is a project in which citizens cooperate to promote in some way the common good and general welfare of the people of the community. It may be doubtful whether either of these corporations would come within the ordinarily understood meaning of the term "civic league." See, however, *Garden Homes Co.* v. *Commissioner*, 64 Fed. (2d) 593, reversing 26 B. T. A. 441. But decision of that question is unnecessary because in any event each was an "organization."

The case turns upon whether or not these corporations were "not organized for profit but operated exclusively for the promotion of social welfare." They call attention to the fact that in section 103 various organizations are exempt from income tax, provided they are not organized and operated for profit, and provided further that no

part of their net earnings "inures to the benefit of any private shareholder or individual", while in the case of civic leagues, the last condition is omitted.  Therefore, they argue that Congress intended to exempt civic organizations which are not organized for profit and are operated exclusively for the promotion of social welfare, even if a part of their earnings inures to the benefit of private shareholders or individuals.  The petitioners discuss two cases in their brief after making the above contention.  Neither case supports the contention made.  They are cases like the case of *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U. S. 578, also cited by the petitioners.  The Court in the latter case held that a religious organization was not subject to tax where, as a mere incident to its religious work, it carried on a profitable business, but used the gain derived therefrom entirely to further the religious work that it was doing.  The other cases cited by the petitioner, including *Unity School of Christianity*, 4 B. T. A. 61, and *Hanover Improvement Society, Inc.* v. *Gagne*, 92 Fed. (2d) 888, are similar cases.  But in the present case the profits of these corporations did not have to be used to further the work which they were doing.  Instead, those profits were used, at least in part, to compensate the private capital which the corporations needed and had to have in order to begin their operations.

The case of *Garden Homes Co.* v. *Commissioner, supra*, is probably more like the present case than any of the others cited.  The mayor of Milwaukee, believing that a shortage of housing facilities existed in the city, appointed a housing commission in 1918.  That commission, in November of the same year, reported that wage earners should be aided in acquiring homes, and suggested legislation to stimulate the erection of homes for them.  A law was enacted in 1918 which granted to housing corporations the general powers of other corporations.  They were also given the power to erect dwellings and lease them exclusively to stockholders of the corporation.  The tenants were not permitted to hold stock in excess of the value of the premises occupied.  No dividends were to be declared upon the stock of the corporation to anyone not a tenant in excess of 5 percent of the par value of the stock.  Ten percent of the profits had to be set aside to retire the preferred stock.  Both common and preferred stock had voting powers.  The mayor had the Garden Homes Co. organized under that law.  It issued over 2,700 shares of preferred stock, a number of which were purchased by the city and county.  The remainder was purchased by numerous firms and individuals who were appealed to on the ground that the project was a civic enterprise and not a money making scheme.  Dividends were paid on the preferred stock.  The corporation secured substantial loans from banks, on which it paid 6 percent.  It constructed 105 houses.  Much of the work necessary for the accomplishment of the project was contributed by various city employees,

without compensation. The corporation had only three salaried employees, whose total salaries were small. The occupants of the houses were required to pay rent. Later, pursuant to an amendment to the law, houses were sold to certain of the tenant stockholders. The directors passed resolutions providing that any excess amounts held by the corporation should be refunded to the property owners at the time of final dissolution. The court held that the owners of preferred stock certificates were in fact creditors and not stockholders. It further held that the monthly payments were not rentals, and, since the excess of those payments over the amount necessary to pay expenses and fixed charges, including dividends on and retirement of the preferred stock, had to be applied in payment for tenant stockholders' common stock, it constituted capital contributions and was not profit to the petitioner. The following quotations are from the opinion of the court:

> In the instant case, however, there was no return whatever to petitioner in excess of the expenses, except the amounts which it was bound to apply upon the common and preferred stock, and in this respect it was acting as a mere conduit, without remuneration except its expenses, in performing the promise it had made to the tenant stockholders.

>       *         *         *         *         *         *         *

> If the so-called dividends upon the preferred stock and the payments upon the common stock are to be considered as profits to the taxpayer, then the intention of the parties and the object of the organization will be defeated. We are convinced that under the facts here presented petitioner was not organized for profit and that none accrued to it.

It might be said with equal force in the present proceedings that the petitioners were mere conduits which could not retain any of the income as their own. But with all due respect to the Seventh Circuit, we do not think that the conduit theory is a sound one upon which to hold that the present petitioners were not organized for profit. This question is not entirely dependent upon whether they were engaged in social service. Suppose that a corporation existed which was like this one except that its tenant stockholders were in higher income groups, so that the social welfare feature would be eliminated. Would anyone contend that the corporation was not organized for profit or that it did not have any income merely because that income had to be used to pay off a mortgage, to retire the preferred stock, to pay dividends on preferred stock, to pay expenses of the corporation, or to make a refund to the tenants? Most corporations exist only to earn profits and to distribute those profits to their stockholders. These two petitioners earned profits and those profits can not be distinguished from the profits earned by any other corporation. The statute contains no provision that all corporations which return their earnings to their stockholders are exempt from tax. Unless there is some specific ex-

emption in the statute, they must pay taxes on their earnings even though they exist only to immediately turn those earnings over to their stockholders. Since it can not be said that these petitioners were "not organized for profit", they must be treated like any other corporation for the purpose of computing their income tax liability. *Cleveland Railway Co.* v. *Commissioner*, 36 Fed. (2d) 347, affirming on this point 10 B. T. A. 310; certiorari denied, 281 U. S. 743. Cf. *Citizens' Water Co.*, 32 B. T. A. 750; *Citizens Water Works, Inc.*, 33 B. T. A. 201.

We are mindful of the fact that these corporations were organized under a special law of the State of New York, which was enacted for the purpose of relieving unsatisfactory housing conditions for residents of the state whose earnings were small, that their surplus could not exceed 12 percent of their capital stock and any excess earnings would either have to be distributed to tenants or turned over to the State of New York upon final dissolution. The state, in limiting the dividends to 6 percent, and in otherwise restricting the projects, did not intend or desire to discourage entirely the use of private capital, which could be interested only by prospects of a profit. The framers of the act sought merely to eliminate the speculative features of a purely commercial enterprise, but they intended to have the projects present a sound investment. The provision for 6 percent on the stock was deliberately designed to encourage the use of private capital in projects which might develop under the act. The private limited dividend corporations organized under the act were permitted to sell their common and preferred stock to any investor who would buy. The purchasers did not have to be tenants. Some of the companies organized under the law were financed by private capital through the sale of common and preferred stock to any investor who would buy. It seems clear that those corporations were organized for profit and were not operated exclusively for the promotion of social welfare. Housing chose to sell its common stock to tenants only, but that was not true of its preferred stock. Although the preferred was rather closely held, the record does not indicate that the purchasers were not prompted to make their investments because of the prospects of financial profits. Each corporation was in position to permit the sale of its common stock to outsiders. The corporations during the taxable years here in question were operated in such a way as to permit the payment of dividends on the preferred shares. Those preferred stockholders were just as much stockholders as are preferred stockholders of any other corporation. Neither of these organizations comes within the provisions of section 103 (8). Each was organized in part for profit, even though the profit was limited, and neither was operated exclusively for the promotion of social welfare.

In *United States* v. *Anderson*, 269 U. S. 422, the Court said that the departmental regulation permitting returns to be made in accordance with books kept on an accrual system of accounting was to permit expenses which are incurred in and properly attributable to the process of earning income to be charged against the income thus earned. It permitted a tax to be accrued in advance of the assessment of the tax where all of the events had occurred which fixed the amount of the tax and determined the liability of the taxpayer to pay it. These taxpayers were required to renovate their apartments at least every so many months. The need for the renovating was obviously occasioned by the occupancy and use of the apartments during the preceding period of months, and the petitioners set up a reserve from the rent received during that period sufficient to pay, for the renovating at the end of the period. Although that method may have been good accounting, nevertheless, until the end of the period the events had not occurred which determined the liability of the taxpayers to pay for the renovating represented by the additions to their reserves. They did not have to wait until they had actually paid for the renovating before they could accrue their liabilities to pay for that renovating, but, on the other hand, they could not properly accrue as an expense the estimated cost of the renovating prior to the end of the period of months, and prior to the time that the painter rendered some services. *Yost Auto Co.*, 26 B. T. A. 685; *Hallack & Howard Lumber Co.*, 18 B. T. A. 954; *Quality Roofing Co.*, 16 B. T. A. 1371; *Jahncke Shipbuilding Co.*, 11 B. T. A. 479; *McCauley-Ward Motor Supply Co.*, 10 B. T. A. 394; *Amigo Coal Co.*, 8 B. T. A. 598. Although the petitioners were obligated to renovate, they had no liability to pay anyone anything until someone had performed some services. The accrual is for services in renovating, not of the duty to renovate. The accrual method does not permit the anticipation of future expenses prior to the rendition of the services for which the payment is due.

Reviewed by the Board.

*Decision will be entered for the respondent.*

---

OPPER, dissenting: We are with deference compelled to depart from the majority opinion, since it seems to us this proceeding should have been decided in favor of petitioners on the authority of *Garden Homes Co.* v. *Commissioner*, 64 Fed. (2d) 593, which we are unable to distinguish. Discussion of the first point decided by the majority would then have been unnecessary. In view of the explicit legislative findings not only of the State of New York, but more recently of the United States (U. S. Housing Act of 1937, sec. 1, 50 Stat. 888), and of the underlying factual basis which is a matter of public record,

we prefer not to treat the first part of the majority opinion as concluding that the construction and operation of housing for families of low income is not a governmental function. There may well be grounds for disposing of the constitutional issue not apparent in the majority opinion, and proceedings arising in the future will perhaps require their consideration. But, in view of our belief that the proceeding before us should have been determined as a matter of statutory construction, we are of the opinion that discussion of the constitutional question was superfluous.

KERN agrees with this dissent.